## HERNDON v. CONTINENTAL–AMERICAN BANK & TRUST CO.

### Civ. No. 504.

District Court, W. D. Louisiana, Shreveport Division.

April 3, 1943.

Henican, Carriere & Cleveland, of New Orleans, La., for plaintiff.

Cook, Cook & Egan, of Shreveport, La., for defendant.

DAWKINS, District Judge.

Plaintiff's original petition was short, simply alleging that he was the owner of three policies of life insurance, issued by the Prudential Insurance Co. of America, numbered respectively, Nos. 5,018,012, 5,-229,937 and 5,229,938, each for the sum of $10,000, the first dated April 8, 1925, and the other two both on November 5th of the same year; that the defendant had possession of said policies, had received and was still receiving certain benefits therefrom; that the policies should be returned to plaintiff and the bank required to account for what it had received; and finally that plaintiff "does not know under what facts the defendant pretends to hold such policies, consequently plaintiff reserves all his rights, particularly the right to contest the validity of any contract, agreement, notes and other purported evidence of authority to withhold the said policies". The prayer was for the relief stated.

Defendant, on June 26, 1941, answered admitting that it held the policies in question and was receiving certain benefits therefrom, under circumstances with which the plaintiff was entirely familiar; that they had been pledged or assigned to secure indebtedness amounting to many thousands of dollars; that, in spite of the assignments, plaintiff had contended that he had an interest therein, and "on March 9, 1934, the said Herndon by contract of sale, sold to Continental American Bank and Trust Co., Ray P. Oden and Paul M. Browne all his interest in the three policies (as well as the monthly disability benefit referred to in paragraph 8 of this answer) with the exception of the sum of $3,000 to be paid at the rate of $30 per month out of policy No. 5,299,937"; and that on November 27, 1935, the plaintiff had sold to C. P. Shows all "his right to the unpaid portion of the $3,000" and the latter in turn had transferred it to Oden, who then conveyed it to the defendant bank; and that on October 23, 1936, plaintiff, by letter bearing that date, had recognized and confirmed those transactions and obtained through attorneys E. W. and P. N. Browne an option to repurchase said policies for $8,500, and at the same time obtained a loan of $500. Defendant prayed that it be recognized as the owner of said policies and for judgment on a cross claim for $500 representing the loan made pursuant to the letter of October 23, 1936.

On December 25, 1941, defendant filed its motion for summary judgment, based upon the alleged sale of March 9, 1934, referred to above, the transfer of the monthly dis-

ability benefits of $30 by plaintiff to Shows of October 14, 1935, and its later conveyance to defendant, and the letter of plaintiff to E. W. and P. N. Browne of October 23, 1936, which it claimed had been accepted and complied with by the defendant. Attached to the motion were the affidavit of Oden and P. M. Brown, together with photostatic copies of the various documents, which defendant claimed supported its right to relief. Prior thereto, on October 28, 1941, plaintiff had filed his own affidavit consisting of some 41 pages, in which he recited at length the history and circumstances under which defendant had come into possession of said policies (notwithstanding he had denied knowledge of these matters in his original petition), which is too long and complicated for summarizing at this point. The principal charges were that Oden and Brown had been the personal friends and confidential advisers of plaintiff and that the assignment of the two policies, issued November 5, 1925, on January 4, 1927, had been for the sole purpose of enabling Oden and Brown, "in event of plaintiff's absence or illness, to make loans thereon to pay premiums;" but that in December 1927, when plaintiff sought to make loans on the two policies, dated November 5, 1925, the checks to cover said loans were made payable to "James R. Herndon and the American National Bank and/or Bank and Trust Co. of Louisiana, assignee", which was the first knowledge that plaintiff had that the assignments which he had signed "in blank" had been filled in so as to include the banks; that plaintiff had protested to Oden and Brown about this but was advised by Oden "that inasmuch as whatever money may be needed for the payment of premiums, would, in all probability be borrowed from one of the said banks, affiant permit the assignments to stand as written", and that as to other limitation in the assignments other than the purpose for which they were made "he had discussed the request with the agent for the Insurance Co. and was informed that said company would not permit such alteration of its assignment forms", and that Oden assured plaintiff "that the said policies would be used only for the expressed purpose", that is, to pay the premiums. Further, that plaintiff's health had failed and he had been compelled to close out his business and go to California in January, 1930; and that because of his faith in "his confidential and trusted advisers Ray P. Oden", the three policies were left in the latter's "care, custody and * * * physical control" to be used solely for the purpose of paying premiums.

Plaintiff described numerous and extended transactions in which he, Oden Brown and the Banks had engaged over the years from 1925 until plaintiff went to California in 1930; also the taking over by the American National Bank of the American Bank & Trust Co., the sale thereafter by the former of its assets to the Commercial American Bank & Trust Co., and finally the change of name to Continental-American Bank & Trust Co., the present defendant. He traced and attacked the transactions under which defendant claims to have acquired the policies, and recited the extent and circumstances of his illness, which made him physically and mentally unfit to enter into the agreements upon which defendant relied for summary judgment. Many charges of fraud and misrepresentation on the part of the officers and agents of the bank, including Oden and Brown, principally the former, were described.

On October 31, 1941, the motion for summary judgment was tried and submitted upon the affidavits and counter affidavits and exhibits, after oral argument, and briefs to be filed. The record reached the hands of the court about the middle of December, 1941, and on January 14th following the motion was denied. On the same day answer to the counterclaim was filed and on March 9, 1942, a supplemental reply thereto was also filed.

Trial on the merits started June 22, 1942, and was concluded on the 29th, except that it was left open to permit plaintiff to take the testimony of a doctor who had treated him in Los Angeles, California. The court reporter's notes have not been transcribed, but briefs were filed and the record transmitted to this court on February 5, 1943, after the court had, at plaintiff's request, agreed that it would attempt to decide the matter without a transcript of the testimony. It is therefore impossible to refer to the testimony of any particular witness except such as was taken by deposition, but the court will endeavor to dispose of the case upon its best recollection of what was said by the principal witnesses, together with the documentary evidence, which, as previously stated, is quite voluminous.

At the beginning we are confronted with certain settlements or compromises, which, unless they can be set aside, constitute a

bar to plaintiff's demands. The first was the agreement of March 9, 1934, and the second, the transfer by Herndon to Shows of the interest which had been retained in one of the policies. These two documents are as follows:

"Whereas, the liquidators of the American National Bank of Shreveport, Louisiana, hold as collateral three policies issued by The Prudential Insurance Company of America on the life of James R. Herndon, numbered 5018012, 5229937 and 5229938, in face value Ten Thousand ($10,000.00) Dollars each, and dated April 8th, 1925, November 5th, 1925, and November 5th, 1925, respectively, of which policies the full loan values—approximately Fifteen Hundred ($1,500.00) Dollars each—have been used for payment of premiums at various times, and

"Whereas, these policies were assigned to the American National Bank and/or the American Bank & Trust Company, of Shreveport, Louisiana, to protect and guarantee certain indebtedness to the said Banks by the said James R. Herndon; and for convenience, later assigned by the Liquidators of the said Banks as follows:

"Policy No. 5018012 to the Continental-American Bank & Trust Company of Shreveport, La.

"Policy No. 5229937 to Ray P. Oden and Paul M. Brown

"Policy No. 5229938 to Ray P. Oden and Paul M. Brown

said last named parties hereinafter known as the assignees, and

"Whereas, disability benefits under Policy No. 5018012 are now being paid to James R. Herndon, and monthly payments are being made to the assignees under contract contained in Policies Nos. 5229937 and 5229938, and

"Whereas, the said James R. Herndon is in need of medical care and attention, and has claimed certain equities and rights under the above described policies, and the assignees have agreed to pay to the said James R. Herndon the sum of One Thousand Dollars ($1000.00) in cash, and to release to him that part of Policy No. 5229937 which will net to him Three Thousand Dollars ($3000.00) in insurance, payable under said policy contract, and

"Whereas, the said James R. Herndon has agreed to renounce and relinquish in favor of the said assignees, any and all rights and claims and demands of whatsoever nature that he may have in and to the said policies of insurance or any payments of whatsoever nature to be made thereunder to said assignees other than such as are specifically reserved by him as hereinabove set out,

"Now, Therefore, in consideration of the premises, and of the cash payment of $1000.00 received by him from the said assignees; and in further consideration of the re-assignment by the said assignees to the said Herndon of a net interest equal to $3000.00 insurance in that policy issued by The Prudential Insurance Company of America, above described, No. 5229937, I, the undersigned, the said James R. Herndon, do forever renounce and relinquish and release unto and in favor of the said assignees, or any of them as their interest may appear, or their transferees or assignees, any and all rights or claims of whatsoever nature which I may now hold or would hereafter acquire, in my favor, or any other parties other than the said assignees, their transferees or assignees, in, under and by virtue of said three policies of insurance, provided, however, that this relinquishment and release will in no way effect the disability benefits under Policy No. 5018012 now being paid me, and the said $3000.00 in insurance being assigned to me in Policy No. 5229937 above described.

"Thus done and signed before *J. M. Eastin* and *R. S. Powers,* competent witnesses, on this *9th* day of March, 1934, at Los Angeles, California.

*"James R. Herndon*

"Attest:

*"J. M. Eastin*

*"R. S. Powers"*

The following is the second agreement or assignment of October 14, 1935:

"State of California

"County of Los Angeles

"Personally came and appeared before me, the undersigned authority, James R. Herndon, a resident of the City of Los Angeles, State of California, to me well known, who declared unto me, Notary, that, for and in consideration of the sum of Twelve Hundred Fifty and No/100 ($1250.00) Dollars, cash in hand to me, paid by C. P. Shows, of Shreveport, Louisiana, the transferee herein, and the additional consideration of the assumption by the said C. P. Shows of an indebtedness due by the said James R. Herndon to Paul M. Brown, of Shreveport, Louisiana, he does by these presents assign, transfer, release and de-

liver unto and in favor of the said C. P. Shows all of his right title and interest in and to that certain contract, and payments to be made thereunder, executed by the said Herndon of date March 9th, 1934, and attested to before C. A. Eastin, Notary Public, under the terms of which, the said Herndon was to receive a total of Three Thousand and No/100 ($3,000.00) Dollars at the rate of Thirty and No/100 ($30.00) Dollars per month from the proceeds of a certain life and health insurance policy written on the said Herndon by The Prudential Insurance Company of America in the original amount of Ten Thousand and No/100 ($10,000.00) Dollars, and Numbered 5229937, the original of which contract for payment of $3,000.00 is annexed hereto and made part hereof.

"In making said assignment, the said Herndon declares that he has been paid the regular payments of $30.00 per month from date of said contract; and it is understood further that this agreement will constitute an order on Ray P. Oden and Paul M. Brown, assignees of said policy, and proceeds thereunder, to pay all further payments due under said contract to the said C. P. Shows.

"The said Herndon hereby releases and relinquishes unto and in favor of said Shows any and all rights he may now have in and under said contract together with all unpaid monthly payments as therein provided for.

"Thus done and signed before *R. S. Powers* ——— *and L. L. King* competent witnesses, and me, the undersigned Notary Public, on this *14* day of October, A. D., 1935, at Los Angeles, California.

*"James R. Herndon*

"Attest:
"*R. L. Powers*
"*L. L. King*
    "*C. A. Eastin.*
    "Notary Public."

There was a third instrument consisting of the letter dated October 23, 1936, by plaintiff, to E. W. and P. N. Browne, attorneys, which the defendant claims was a further ratification or confirmation of the settlements which had been made in the first and second documents just quoted. That letter is as follows:

"Messrs. E. W. & P. N. Browne,
  "Shreveport, Louisiana.
"Dear Sirs:
  "This confirms the proposal I am making to your clients, Messrs. Ray P. Oden, P.

M. Brown, Jr., C. P. Shows and others, assignees and transferees of the three insurance policies and proceeds thereof in the Prudential Insurance Co. of America, described as follows, to-wit:

"No. 5 018 012—original amount $10,000.00
5 229 937—   "    "   10,000.00
5 229 938—   "    "   10,000.00

all of said policies being written on my life by the Prudential Insurance Co.

"1. It is understood that I have no interest whatsoever in any of the policies above described or any proceeds to be derived therefrom, same having been originally assigned to the American National Bank of Shreveport, as follows:

"No. 5 018 012 — May     5th, 1925
5 229 937 — January   4th, 1927
5 229 938 — January   4th, 1927,

and I later relinquished any interest I might have had in the above three policies in an agreement made on March 9th, 1934, by notarial act, for the considerations therein set out, which assignments, releases and relinquishments I hereby now declare to be binding and valid in every way, and I hereby acknowledge the correctness of same.

"In said contract I was to receive a $3,-000.00 equity in one of the above numbered policies, payable at the rate of $30.00 per month, which equity I sold and discounted to C. P. Shows of Shreveport, La., for a consideration of $1,250.00 cash duly received by me.

"As you know, I am sick and in need of special medical treatments, and I have some friends who probably will assist me in repurchasing the entire interest your clients hold in said policies, thus giving me possibly some equity therein. For this reason I now propose that your clients grant me a ninety day option to repurchase all interests they have in said policies for a cash consideration of $8,500.00, such interest to include only all future payments to be made and due on said policies after November 5th, 1936. This is to be considered as a binding proposal on my part, and when accepted by you here for your clients below, same is to be binding likewise on your clients, but I will not in any way hold your firm or any members thereof personally responsible.

"It is understood that your clients have no interest whatsoever in the monthly life disability benefits of said policy No.

5018012, which is now paying me $100.00 per month.

"I have requested of your clients a loan of $500.00, payable in four years from date hereof, and if such loan is granted it is understood that in case I, or my friends exercise the ninety day option just proposed that the $500.00 loan will be repaid at the same time, thus making a total to be paid to your clients of the sum of $9,-000.00 before your clients may make such assignments and transfers of their rights to said policies as above set out.

"Yours very truly

· "J. R. Herndon.

"Approved, this 23 day of October, 1936.

"*Percy N. Browne*

"Agent and Attorney."

Plaintiff's brief, which is in accord with the oral argument, charges that "he has been the victim of a fraudulent scheme devised and executed primarily by Ray P. Oden, one of defendant's executive officers", who "planned and executed this entire scheme".

In the early and middle twenties, plaintiff was a man of some means, engaged in the real estate and insurance business. On April 8, 1925, the Prudential Insurance Co. of America had issued him the first of the three policies, No. 5,018,012, and on November 5th of the same year, the other two policies, Nos. 5,229,937 and· 5,229,938, all for the sum of $10,000 cash upon plaintiff's own life. On May 5, 1925, plaintiff executed an assignment of his first policy, which he says was in blank, but as it appears attached to the policy, to the American National Bank. At that time Herndon was indebted to the American National Bank in the sum of $19,254.50. On January 4, 1927, he also executed assignments of the two policies issued November 5, 1925, to "American National Bank and/or American Bank & Trust Co", but here again he claims that the assignments were in blank to Oden and Brown. On this latter date Herndon's indebtedness to the two banks amounted to $67,411.13.

Plaintiff's contention is that he had a definite understanding with Oden and Brown, his close personal friends and confidential advisers, who were also officers of the said Banks, that all three assignments were for the sole purpose of enabling those gentlemen, in case of Herndon's absence or illness, to borrow money thereon for the payment of premiums, if necessary. In the brief, his counsel says that he closed out his insurance and real estate business at the end of 1926 (December 8th) and began devoting his entire time to the operation of his two plantations, "Allen" and "Arcola", which were about 175 miles apart. It is also stated in the brief that the "parties are in agreement over the fact that the plaintiff borrowed considerable sums from time to time from the American National Bank and the American Bank and Trust Co. prior to December 1926; and that some of these loans were made on plain hand notes and on collateral notes, * * * usually mortgage paper and/or crop liens and/or shares of corporate stock". But it is asserted that the evidence shows "all these amounts were settled". However, on April 29, 1926, Herndon had executed a mortgage upon Allen Plantation, situated in Natchitoches Parish, to secure a mortgage note in the sum of $50,000, which on March 12, 1929, was held by American Bank & Trust Co., for on that date, the latter signed a notarial consent to its reduction to the sum of $3,-500, requested by plaintiff and the Beane Bros. or Haynesville Mercantile Co., which was duly recorded in the mortgage records of that parish. This mortgage note had been attached to a plain one of Herndon's for the sum of $52,128.18, dated February 20, 1928, as collateral security, together with a "crop lien" for $30,000 and a "chattel mortgage" in the sum of $20,000. The mortgage note was secured by a second mortgage upon the Allen Plantation, given at the time of its purchase by Herndon on April 29, 1926, to cover a portion of the purchase price evidently borrowed from the American Bank & Trust Co.

In the meantime, that is, after beginning his farming operations at the end of 1926 or the beginning of 1927, and by the 20th of February, 1928 (the same date on which the plain note for $52,128.18 was executed), plaintiff had become indebted to the American Bank & Trust Co. to the extent of an additional $14,386.40 as disclosed by a note executed on that date and secured by 20 shares of stock in the Shreveport Packing Company "par value $10,000". Prior thereto, on July 21, 1927, plaintiff had also executed with C. C. Herndon another note for $3,000, which, whatever may have happened in the light of·the conflicting statements of himself and witnesses for the defendant, remained in the hands of the bank.

The American Bank & Trust Co. also held another note for· the sum of $2,500

dated January 28, 1928; and under date of March 30, 1928, Herndon had executed another note in favor of the American Bank & Trust Co. in the sum of $6,836, due October 15th following, which bears on its face, in the space for security, "Second Mortgage Allen P", undoubtedly meaning Allen Plantation.

There was offered in evidence a certificate of mortgages (Exhibit Oden 28) made by the Recorder of Natchitoches Parish, which shows cancellation of chattel mortgages and crop liens, as follows:

"The State of Louisiana

"Parish of Natchitoches

"Be it known that this day before me the undersigned notary public in and for the parish of Natchitoches, state of Louisiana, duly appointed, qualified and sworn came and appeared B. S. Swett, the duly qualified, elected, sworn and acting Clerk of the 10th Judicial District Court in and for the parish of Natchitoches state of Louisiana, who being by me duly sworn on his oath deposes and says;

"That the following described instruments appear of record in the office of the Clerk of the 10th Judicial District court, and that the same show to have been cancelled in full under the dates hereinbelow shown;

"Mortgage and crop pledge in favor of the American National Bank, dated February 23rd, 1929 in the sum of Thirty Thousand dollars, cancelled March 15th, 1929.

"Mortgage and crop pledge in favor of American National Bank, dated February 10th, 1928, in the sum of Thirty Thousand dollars, cancelled March 13th, 1929.

"Chattel mortgage and crop pledge in favor of American National Bank, dated February 1st, 1927, in sum of Twenty Thousand dollars cancelled March 15th, 1929.

"Chattel mortgage and crop pledge in favor of American National Bank, dated February 1st, 1927, in sum of Twenty Thousand dollars, cancelled March 15th, 1929.

"*B. S. Swett.*

"Sworn to and subscribed before me this October 23rd, 1941

"*Lennie M. Scarborough*

"Notary Public

"Natchitoches Parish Louisiana."

Thus, it would appear that when Herndon gave up his real-estate and insurance business at the end of 1926 and began to devote his entire time to farming in 1927, he had found it necessary, in his operation of the Allen Plantation, to borrow funds to make the crop for that year, for which he executed on February 1, 1927, two chattel mortgages and crop pledges in favor of the American National Bank, each in the sum of $20,000. This was less than a month after the date of the assignments of the two policies (January 4, 1927) which were issued November 5, 1925. Herndon contends that he had previously executed the assignments in December, but these, for some reason had been disregarded and the ones of January 4, 1927, were signed; while witnesses for defendant explain that the first forms had not conformed to the requirements of the insurance company, and the later ones were accordingly executed.

It will be noted that Herndon again executed similar chattel mortgages and crop pledges on February 10, 1928, and February 23, 1929, respectively, each for the sum of $30,000, and that all these crop liens and pledges were cancelled on March 15, 1929, about the time the second mortgage note on the Allen Plantation was reduced from $50,000 to $3,500.

Herndon does not deny but admits that about the time these two policies were assigned, discussion had taken place on the point that he should obtain term insurance to secure his then existing and future indebtedness to the American Banks, and that it was found the rates were such, in view of the condition of his health, as to make it prohibitive. It is at this point, however, that his testimony is in serious conflict with that of defendant's witnesses. He admits that no additional insurance was obtained, but denies that he agreed that the two policies dated November 5, 1926, should be pledged, while Oden and other witnesses for defendant say that, after the proposal to furnish term insurance had fallen through, Herndon agreed to and did assign those policies to the bank as securities for both past and future indebtedness. He admits that he had discovered the assignments were in favor of the Banks, when the first loans to pay premiums were made, as above stated. Up to that time, that is through the latter part of 1926, 1927, 1928 and 1929, Herndon does not contend that he had become so incapacitated by illness as to prevent his attending to business, but claims that he was lulled into a sense of security by the assurance of Oden and Brown, in whom he had great faith and

confidence, that the policies would be used for payment of premiums only. The latter insist that the documentary evidence accords with the facts. In the face of this conflicting evidence, what are the reasonable probabilities or what would have been the usual and ordinary conduct of the parties? It can scarcely be denied, in fact, as above pointed out, plaintiff's counsel admit that "plaintiff borrowed considerable sums from time to time from the American National Bank and Trust Co. prior to December 1926 * * *".

Laying aside therefore, for the present, any question of personal friendship for plaintiff by the bank's officers, the natural and reasonable thing would have been for these officers of the Banks to insist upon Herndon furnishing adequate and additional security for his obligations as they continued to increase. The mortgages upon the plantations were both second liens, and after failing to obtain the term insurance, what would have been more natural than to ascertain if he had other insurance, which would be assigned? He, himself, says that all these policies had been endorsed, either in blank or to Oden and Brown and were therefore known to defendant's officers to exist; hence, it is highly probable that they would have insisted upon his using them to protect the banks. Herndon admits that the first policy had been pledged at one time for some of his indebtedness, but claims that this was discharged, although the facts seem to indicate that his obligations were increasing rather than diminishing, and he produces nothing more than his own statement of the payment, which is vigorously denied by the officers of the bank. What has been said up to this point deals, of course, with the initial fact as to whether the policies were pledged for obligations due the banks. If so, then plaintiff, by denying the fact, could not consistently point to any circumstances showing that the last two had been subsequently released. Plaintiff insists that Oden and Brown, particularly the former, schemed to defraud him from the beginning and therefore misled him with regard to the purpose and contents of the original assignment, with a view of profiting from these policies. However, except as to such cash values as the policies had or were acquired with the lapse of time, the same were used to pay premiums, and it was not until Herndon established his permanent total disability about the first of June, 1933, that anything could be realized from that source. This was about six years after the assignment of the policies dated November 5, 1925, and longer as to the one issued in April of that year, and many years after he knew that the banks had been named as assignees. Some three years had elapsed from the assignments, on January 4, 1927, of the two policies issued at the same time, and the departure of Herndon for California in January, 1930. Therefore, the court can not be much impressed with the idea that there was a preconceived plan to defraud plaintiff when these policies were originally assigned.

Plaintiff, while apparently admitting that he was heavily indebted to the two American Banks in March, 1929, insists that the transaction in which Haynesville Mercantile Co. or Beane Brothers participated on the 12th of that month, settled and discharged it all. This, the officers of the bank strenuously deny. Laying aside for the moment the testimony of the witnesses, consisting of that of plaintiff for himself, Oden, Brown and McCutchen for defendant, let us see to what extent the undisputed facts and circumstances tend to support or contradict their positions. At the time of the transfer to Beane Brothers of an interest in the stock of the Arcola corporation, as earlier stated, the property was burdened with a first mortgage of some $65,000, and the banks held Herndon's note for a little over $52,000, secured by a second mortgage upon this property for $50,000, and a crop lien of $30,000. In order to induce Beane to come into the matter the mortgage was reduced to $3,500 and the crop lien was cancelled after the payment to the bank of $1,500. In other words, in place of obligations of Herndon amounting to $80,000, secured as indicated, the banks received a total $5,000 ($3,500 reduced mortgage and $1,500 cash). Does it seem reasonable, therefore, that the banks, if they held these policies under assignment, as has been concluded that they did, the same would have been given up after taking such a tremendous loss with respect to the Allen Plantation of the Arcola Company? It must be kept in mind at all times that the policies had not acquired any value beyond the cash surrender, which, as earlier stated, had been absorbed in paying premiums, and hence offered little inducement to anyone having designs on them as plaintiff contends. Yet, if they had been assigned, it would seem that good business judgment dictated that the officers

of the bank retain them for its benefit. Plaintiff's position in this matter is contradicted, not only by the circumstances, including the retention of the policies by the bank, but by the witnesses, which included, in addition to the officers of the bank, the other parties to the transaction with Beane, who are not shown to have had any interest in the outcome of this suit. The court is therefore forced to conclude that the evidence substantially preponderates against the cancellation of either the large indebtedness, which plaintiff was left owing the banks, or the assignments of these policies.

This brings the matter up to the point when plaintiff, because of his illness, found it necessary to go to California. He remained there for several years, under the care of physicians, suffering from a serious ailment. In the meantime, the American Banks went through the agencies of the depression. The American National Bank, on October 20, 1930, took over all the assets of the American Bank & Trust Co. except a note of its directors which was cancelled, and assumed its liabilities, other than those to its stockholders; on the same day the Commercial Bank & Trust Co. acquired from the First National Bank, the combined assets of the two American Banks, and the National Bank went into liquidation; a short time later the name of Commercial-American Bank & Trust Co. was changed to Continental-American Bank & Trust Co., the present defendant. It appears that the premiums upon these policies gradually grew to be a burden, to such an extent that Oden and Brown undertook to see that the premiums were paid to keep them in force, as they claimed, for the benefit of the American Banks and their transferees. In doing so, they continued to borrow as much as they could thereon to pay premiums, and actually advanced other funds when required. It is true that the policies were not assigned to the successor banks until some time later, but at the time of the agreement of March 9, 1934, between plaintiff and defendant bank, the established disability of Herndon had produced substantial sums from the disability benefits. The first policy provided for the payment of $100 a month, without diminishing the face amount to be paid at death, while the other two were being consumed by said payments. The result was that, when the first agreement was made, enough had accumulated out of which to pay Herndon the $1,000, which he received at that settlement, and no doubt to warrant his being awarded the sum of $3,000, to be paid at the rate of $30 per month out of the proceeds of policy No. 5,229,937. He was permitted to continue to receive the $100 per month from the first policy, since this did not reduce the amount which the banks would receive at his death. Undoubtedly, Herndon was in financial distress because of his illness and the involved condition of his affairs, but even his own witnesses, the doctors who attended him, did not say he was incapable of understanding serious business transactions, except when in the extreme pain of an acute attack. Each of these witnesses said however that anyone in his condition, that is, with angina pectoris, should have complete rest, mental and physical. Herndon's need for funds to pay the expenses of his illness was such that he was compelled to undertake some adjustment with the defendant, in order to meet his bills. His doctors say he could have done this but not as well as one in good health. As stated earlier, Herndon's disability was established about the first of June, 1933, but it was several months later, in the month of December of that year before the defendant and its assignees, Oden and Brown (to whom the banks had assigned the policies to protect them in the payment of premiums) were able to induce the Insurance Company to make payment. Herndon had been in correspondence with it and had protested against the payments, claiming he had not assigned these policies to secure his debts to the banks, but finally the Insurance Company commenced paying the benefits notwithstanding Herndon's protests, the first check on the two policies dated November 5, 1925, having been for $1,195 and covered the periods from June 3 and July 1, 1933, to December 1st of that year. It was, no doubt, because of the fact that the Insurance Co. had decided to make payments to Oden and Brown, as assignees of the American Banks, that Herndon was finally induced to enter into the compromise settlement of March 9, 1934. It was shown that Oden had deposited the proceeds of collections from these polices in his personal account, and plaintiff urges this is another evidence of the designs which Oden and Brown, especially the former, had upon his policies from the beginning. For reasons already stated, the court is of the view that the plaintiff, upon whom the burden of proof rests, has not sustained this contention.

The assignments by the banks through M. A. McCutchen, as president of both, to Oden and Brown, was on May 5, 1932, while that from them to the Continental American Bank and Trust Co. was under date of November 25, 1938. Counsel for Herndon goes at length into the circumstances of the taking over of the American Bank & Trust Co. by the American National Bank, the assets of the American National Bank by the Commercial American Bank & Trust Co. and the going into liquidation of the American National Bank, in which these policies were not specifically described, as supporting the contention that the banks can lay no claim thereto, and as showing that Oden and Brown were, at all times, scheming to deprive plaintiff of his insurance. What has been said earlier as to these policies being liabilities rather than assets, is equally applicable to conditions existing in 1932, when the assignments were made to Oden and Brown. In 1938, the settlements of March 9, 1934, and October 14, 1935, had long since been consummated.

If the policies were legally assigned to the American Banks, as above found, then it would seem that plaintiff has no legal ground to complain about transactions between Oden, Brown, the defunct banks and the present defendant. As earlier pointed out, Oden and Brown testified that they served as voluntary trustees more or less to keep these policies alive for the ultimate benefit of the banks, and that they were to receive such consideration, in addition to reimbursement for what they had expended, as might be determined to be due them. The court does not feel called upon to discuss in detail these internal transactions among the several individuals and banks, for the reason that plaintiff could not benefit, unless he were able to establish in some way that his debts to the banks, for which the policies were assigned, were paid, or that the policies were otherwise released. This he has not been able to do.

Plaintiff's attack upon the transaction by which he sold to Shows the remainder of his $3,000 of insurance covered by policy No. 5,229,937 is upon substantially the same grounds, that is, the fraud and misrepresentation of Oden, his incapacity resulting from bad health, etc. It is true that he was, as stated above, in great financial distress, caused by his long illness, but in this instance, there is no more support in the proof of his mental incapacity than there was with respect to the contract of March 9, 1934. It will be recalled that the benefits under this policy, although paid monthly, were gradually consuming its face value ($10,000). Plaintiff had, since the settlement of March 9, 1934, and up to October 1935, received his $30 a month, thereby leaving a balance of approximately $2,500, which he sold to Shows for a consideration of $1,250. Here again, as in the payment of $1,000 under the first agreement, he points to the fact that the money came from funds collected on the policies; and he refers to the dickering between himself and banks, which finally resulted in the sale of this interest as further evidence of the fraud and bad faith of Oden and others, for the reason that, although it was represented to him that Shows was an outsider proposing to buy the interest, in reality he was interposed for Oden and the Banks who furnished the money from the proceeds of the policies. It is hard to see how this could benefit plaintiff, at least at that time, when he and Oden with all others representing the Banks were dealing at arm's length, and if the funds collected from the Insurance Company were lawfully received under the assignments, there would appear to be no reason why they could not be used to pay him the same as any other monies belonging to the Banks.

The letter of October 23, 1936, recited at length the facts and circumstances surrounding the assignments of all three policies, the settlements of March 9, 1934, and October 14, 1935, and was addressed to the firm of E. W. and P. N. Browne as a proposal to "Your (their) clients", Oden, Brown, Shows, "and others" as "assignees" of all the policies. Plaintiff claims this proposal was never accepted; that only the original of several copies was signed by him; that the defendant bank declined to approve and made a proposal of its own, to which he could not agree, and that P. N. Browne, who had formulated the letter, tore up the signed original. However, plaintiff admits receiving the $500 loan which was requested in this letter but denies the option to buy back the policies was granted. One of the carbon copies bearing his signature was produced at the trial. Defendant's witnesses say the agreement was executed, as indicated by the signature in the bottom left hand corner "approved Percy N. Browne, attorney". As heretofore noted, it was addressed to the firm of which Mr. Browne was a mem-

ber, for consideration of "your clients". This document has no value except as to the extent it confirms the contention of defendant with respect to the former statements and to support the crossclaim for $500.

Having thus given full consideration to all the facts and circumstances of this case, including the documentary evidence and such of the oral testimony as the Court recalls, the conclusion is inevitable that plaintiff has failed to sustain the charges of fraud affecting the documents bearing his own signature by which he parted with interests in the policies he now seeks to recover.

There should be judgment for defendant.